```
               UNITED STATES DISTRICT COURT
                       FOR THE
                  DISTRICT OF VERMONT
```

ALLY BANK,                          )
                                    )
        Plaintiff,               )
                                    )
   v.                               )   Case No. 2:19-cv-21
                                    )
STEPHEN W. WEBSTER, in his          )
capacity as administrator           )
of the Estate of Peter James        )
Lynch, and BEST FRIENDS             )
ANIMAL SOCIETY a/k/a BEST           )
FRIENDS ANIMAL SANCTUARY,           )
                                    )
        Defendants.              )

## OPINION AND ORDER

This case revolves around funds held by Ally Bank ("Ally") in accounts established by Peter James Lynch.  Mr. Lynch is now deceased, and there is a dispute about who is entitled to the funds in his accounts.  The parties claiming entitlement to the funds are Stephen Webster ("Webster" or "Administrator") in his capacity as the administrator of Mr. Lynch's estate (the "Estate"), and Best Friends Animal Society ("BFAS").

Both the Estate and BFAS have filed counterclaims against Ally.  Pending before the Court is the Estate's motion for summary judgment on it counterclaims, with the exception of its fraud claim, and on Ally's requests for relief.  For the reasons set forth below, the motion for summary judgment is **denied.**

## Factual Background

The following facts are undisputed unless otherwise noted.

Ally is an online bank headquartered in Utah, with a customer service center in Pennsylvania. An Ally customer may open a Certificate of Deposit or money market account in one of three ways: on-line, by calling Ally's customer care center, or by email. Between 2010 and 2012, Mr. Lynch established three accounts with Ally: a four-year CD on August 12, 2010, a five-year CD on October 18, 2010, and a money market savings account on April 17, 2012. Although each account was established by telephone, Mr. Lynch also sent Ally a signed IRS W-9 form. ECF No. 89-10 at 2. As of late 2019, the aggregate balance of the three accounts was $267,033.82. According to Ally, bank records show that the accounts were established with beneficiaries. The affidavit of Michael Hebling, Senior Director of Deposit Operations at Ally, states that the Lynch accounts were established as payable-on-death ("POD") accounts, as the ownership type was designated as "AB" (standing for account beneficiary). ECF No. 89-1 at 4-5; ECF No. 89-8 at 2.

Mr. Lynch died on September 10, 2017. The monthly account statements sent to him prior to his death did not disclose the presence of a beneficiary. The account statements provided after his death, however, identified the Accounts as "Account ownership: Single with Payable on Death Beneficiary." Ally has explained that this change in account statements was not unique to Mr. Lynch, and was instead a bank-wide policy change

implemented in February 2018.  ECF 89-1 at 6.

The Hebling affidavit states that a Deposit Agreement was sent to Mr. Lynch as part of a "Welcome Kit" each time he opened an account.  *Id.* at 3.  The relevant Deposit Agreement states, in part:

> Payable on Death (POD) or "In Trust For" (ITF) Account – these accounts may be opened as an individual or joint account and allow you to designate a beneficiary or beneficiaries who will receive the funds in your account at your death. . . .  The law of the state in which you reside may restrict these accounts, and we make no representation as to whether the designation of an account as POD or ITF will comply with applicable state law.  You are solely responsible for making sure the account is properly titled and that it meets any other requirements of your state.

With respect to the law applicable to Ally's conduct, the Deposit Agreement provides:

> All of our actions relating to your account, including this Agreement, will be governed by the laws and regulations of the United States and, to the extent not preempted, the laws and regulations of the State of Utah.  Any lawsuit regarding your account must be brought in a proper court in the State of Utah.[1]

Prior to his death, Mr. Lynch granted Stephen Webster power of attorney.  In speaking with Mr. Lynch, Webster determined that Lynch did not use or own a computer.  Ally's records reflect the bank's knowledge that Mr. Lynch had no email address and no on-

---

[1] The Estate argues that BFAS has no standing to enforce the Deposit Agreement, and that Utah law thus cannot apply.  As to Ally, however, there is no dispute that the Deposit Agreement must be considered when reviewing its management of the Lynch accounts.

line access.  Webster further found that Mr. Lynch kept most of his important papers in a leather backpack, which was with him in his hospital room in Vermont.  Those papers revealed the three Ally accounts.  In his discussions with Webster, Mr. Lynch never expressed an understanding that his accounts had designated beneficiaries or payable-on-death arrangements.

On December 4, 2017, the Vermont Superior Court, Windsor Unit, Probate Division appointed Webster as Administrator of Mr. Lynch's estate.  In a letter dated July 19, 2018, Webster provided Mr. Lynch's death certificate to Ally and asked the bank to "post interest to date of withdrawal, close out all three accounts, and send me a check payable to Peter J. Lynch estate for the proceeds."  In a letter dated July 25, 2018, Ally returned the death certificate and thanked Webster for providing "proper documentation to carry out your request for the estate claim."

On July 23, 2018, Ally notified BFAS that "an Ally Bank account held by Peter J. Lynch named Best Friends Animal Society as a beneficiary (Reference # 17079861)."  Ally's records show that BFAS was designated beneficiary as early as January 1, 2013.  ECF No. 89-9 at 4.  The bank's records do not show any change in the beneficiary designation between that time and the date of Mr. Lynch's death.  ECF No. 89-1 at 5.  BFAS responded in a letter dated July 31, 2018, confirming the notification by Ally and

4

requesting release of the account funds.  On August 8, 2018, bank staff recorded an instruction to process checks to BFAS.

There are two additional letters in the record, dated August 9, 2018 and August 14, 2018, from Ally to BFAS stating that a check is enclosed and the Lynch accounts have been closed.  ECF No. 75 at 6, ¶ 24; ECF No. 75-24.  BFAS submits that it never received the letters, and Ally's records show that the funds were withdrawn and then quickly redeposited into the Lynch accounts.

On July 25, 2018, Ally sent a letter to the Estate identifying BFAS as the beneficiary on each of the three accounts.  When Webster called Ally for confirmation of the beneficiary designation, a bank employee entered a notation in Ally's electronic records stating that the bank had been unable "to go back to 2010 when the accts were initially opened to view if the accts were set up with a beneficiary upon acct opening since the[y] were opened in the call center."  Ally submits that its practice with regard to POD accounts included taking the name of the beneficiary over the phone and recording the designation in its system.  Although such calls were recorded for quality control purposes, they were also purged periodically.

On August 7, 2018, Webster wrote to Ally and disputed the designation of BFAS as beneficiary.  He also asked for copies of all signature cards and documentation of the beneficiary designation.  On August 20, 2018, Ally sent Webster a copy of Mr.

5

Lynch's IRS W-9 form dated August 30, 2010, and stated that the bank would give the Estate "21 days from the date of this letter to provide us with a court order which expressly compels the bank to pay the funds into the estate." On August 24, 2018, Webster wrote to Ally acknowledging receipt of the W-9 form and reiterating his request for documentation of a beneficiary designation by Mr. Lynch.

On August 30, 2018, Ally wrote to Webster and explained that "Mr. Lynch's account applications and beneficiary designations were done via the call center, therefore there are no written application documents to provide. Recordings of conversations are no longer available." The bank also extended its demand for a court order to 30 days from the date of the August 30 letter. There is a dispute of fact as to whether Ally's representation about the existence of call records was truthful. ECF No. 75 at 9, ¶ 34.

On September 24, 2018, Webster obtained an order from the Probate Division of the Vermont Superior Court concluding that the funds belonged to the Estate. The order also required payment to the Estate within 30 days unless a hearing was requested within ten days. Webster was apparently unaware that Ally had been in contact with BFAS with regard to its beneficiary status and distribution of the funds.

On October 1, 2018, Ally wrote to BFAS, informed it of the

court order, and reported that the funds would be paid to the Estate unless BFAS provided an order within ten business days preventing payment of the funds. BFAS subsequently sought to participate in the Probate Court proceeding. In its Probate Court filings, BFAS reportedly argued that an electronic signature is sufficient under Vermont law, and that there was reason to rely on Mr. Lynch's communications identifying BFAS as the beneficiary of the accounts. BFAS noted that the order obtained by the Estate had been *ex parte*, and moved that it be stayed until the parties could be heard. On October 29, 2018, Ally similarly moved the Probate Court for a stay.

On December 5, 2018, the Probate Court granted Ally's motion to intervene. The court also concluded that because BFAS was a "stranger to the estate," there was no jurisdiction to adjudicate BFAS's claim of ownership. The court ordered that "Ally Bank shall not distribute the funds held in Mr. Lynch's Ally Bank account until either an agreement between the parties is reached or until a Court of competent jurisdiction determines the ownership of these accounts."

Ally filed its interpleader action in this Court on February 6, 2019. It filed an Amended Complaint on February 27, 2019. The Estate and BFAS are named as defendants, and each has filed counterclaims. The parties have engaged in limited discovery, focusing in part on the forum selection clause in the Deposit

7

Agreement after BFAS moved to transfer jurisdiction.  This Court denied BFAS's motion to transfer, concluding that BFAS could not enforce a provision of the Deposit Agreement prior to a determination that it has rights to the Lynch accounts.

Ally subsequently filed a motion for interpleader relief, asking permission to place the disputed funds into a Court account.  Ally also asked to be dismissed from the case, and moved separately to dismiss all counterclaims.  The Court has granted Ally's request for leave to place the funds into a Court account, but has denied its request for dismissal from the case.  The Court has also denied Ally's motions for dismissal of Defendants' counterclaims.

The Estate now moves for summary judgment, arguing that any POD designation entered into Ally's electronic records, without written authorization, is invalid and unenforceable as a matter of law.  The Estate also posits that Ally secretly added BFAS as a POD beneficiary without Mr. Lynch's knowledge, but does not seek summary judgment on its fraud claim.  ECF No. 74 at 4.  Ally submits that summary judgment is premature and that the Estate's legal arguments are misplaced.  BFAS also opposes summary judgment, though it takes no position on some of the Estate's arguments.[2]

---

[2] The Estate contends that BFAS is not a party to the summary judgment motion, which focuses on Ally's claims for relief and the Estate's counterclaims.  While BFAS's

**Discussion**

I.  **Summary Judgment Standard**

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

II. **Choice of Law**

The parties dispute whether the claims in this case are governed by Vermont law or by the law of the State of Utah. The Estate argues for the application of Vermont law, while Ally and

---

counterclaims may not be impacted by the Estate's motion, its arguments with respect to Ally's claims for relief must be heard, and its views on the many legal and factual issues facing the Court will also be considered.

9

BFAS believe that Utah law applies.  Choice of law is significant because the Estate contends that, under Vermont law, a POD designation requires a written authorization.  Utah law arguably does not require a writing to designate a POD beneficiary.  *Cf. Estate of Wolfinger v. Wolfinger*, 793 P.2d 393, 396 (Utah Ct. App. 1990) (holding that Utah common law allows an account holder to orally authorize his bank to change his individual account to a joint or POD account, so long as that "the facts clearly establish such was the intention of the parties").  There is no evidence in the summary judgment record that Mr. Lynch provided specific written authorization for POD accounts.

Courts sitting in diversity apply the forum state's choice-of-law rules.  *See Cap Gemini Ernst & Young v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003).  Vermont law enforces choice-of-law provisions in contracts.  *See McKinnon v. F.H. Morgan & Co., Inc.*, 170 Vt. 422, 423 (2000).  Here, all parties agree that the Deposit Agreement governs the bank's actions and transactions in this case.  As noted above, the Deposit Agreement states that "[t]he law of the state in which [the customer] reside[s] may restrict" POD accounts.  The Deposit Agreement also requires that Ally's actions be governed by federal law and, to the extent not preempted, Utah law.

The Court finds that, as dictated by the Deposit Agreement, Vermont law applies to the question of whether Mr. Lynch validly

authorized POD accounts. A plain reading of the Deposit Agreement suggests that while Utah law may govern Ally's conduct generally, the law of the account holder's home state can "restrict" a POD account. Mr. Lynch was a Vermont resident, and as the Probate Court properly determined, Vermont has a statute specifically addressing PODs. Accordingly, the Court must determine whether any "restriction" in the Vermont statute entitles the Estate to summary judgment.

### III. Entitlement to the Account Funds

The state Probate Court concluded that a POD requires a depositor's signature, and the Estate urges this Court to adhere to that ruling. In rendering its decision, the Probate Court cited 8 V.S.A. § 14201(b)(2) and § 14205. ECF No. 75-6 at 3, ¶ 10. Section 14201(b)(2) obligates the bank to provide the depositor with "a statement containing the existing terms and conditions of the deposit contract." 8 V.S.A. § 14201(b)(2). Changes to the deposit contract must be noticed in advance. *Id.* Section 14205 states, in relevant part, that a signed POD designation is conclusive evidence of "the creation of an absolute payable-on-death account." 8 V.S.A. § 14205(b).

BFAS argues that the critical portion of Section 14205 is subsection (a), which states that a POD account is created by a deposit in name of an account holder who designates the payee or payees upon his or her death. There is no requirement of a

11

writing or signature in Section 14205(a). While subsection (b) establishes that a signature is "conclusive evidence" of a designation, it does not explicitly require a signature. Nor does the statute exclude the possibility of persuasive, if not conclusive, evidence of intent aside from a signature.

The Estate goes beyond the Probate Court's conclusion and asserts several additional arguments for a writing requirement. First, the Estate argues that a POD account is a form of will, and that Vermont law requires a will to be in writing. *See* 14 V.S.A. § 5. In general, however, when a state legislature has passed a law specifically addressing PODs, a POD is not viewed as a will and does not need to meet the requirements for a will. *See generally* 50 A.L.R. 4th 272-300 (1986); *see also Virginia National Bank v. Harris*, 257 S.E.2d 867 (Va. 1979) (fact that legislature provided that bank may properly pay balance of POD account to surviving designee demonstrates validity of such account, even though not created with formalities specified for wills); *Re Estate of Tonsic*, 235 N.E. 2d 239 (Ohio 1968) (under provision of banking statute, POD deposits are exempt from statute regarding wills).

The Estate also contends that Vermont law requires disclosure to the customer of any funds transfer, including a pre-authorization, and that the existence of POD accounts was never disclosed until after Mr. Lynch's death. *See* 9A V.S.A. §

4-406. The record is not clear that Mr. Lynch was completely unaware of POD accounts, as viewing the facts in the light most favorable to the non-moving parties, there is evidence of POD designations. It is also not apparent from the law cited by the Estate that payment to a POD beneficiary is legally equivalent to a transfer of funds, whether pre-authorized or not.

The Estate next cites the federal Electronic Funds Transfer Act ("EFTA"), under which "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer." 12 C.F.R. § 205.10(b). An "electronic funds transfer" includes a transfer of funds initiated via telephone "so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). However, "electronic funds transfer" excludes "any transfer of funds which is initiated by a telephone conversation . . . which is not pursuant to a prearranged plan and under which periodic or recurring transfers are not contemplated." 15 U.S.C. § 1693a(7)(E). This provision seemingly applies here, as Mr. Lynch allegedly established the POD beneficiary via telephone, and the designations were not part of a prearranged plan for recurring fund transfers. *Id.*[3]

---

[3] The Estate argues that this exclusion does not apply because the record does not support a finding that call center workers are each "an officer or employee" of Ally. The relationship between Ally and a third-party call center is, at this stage, unclear, and the parties have not fully briefed

13

The Estate's final argument for a writing is that Ally violated the E-Sign Act by failing to disclose the entry of POD information in its electronic records.[4]  The Estate also contends that under the EFTA, Ally was required to disclose the terms and conditions of "electronic fund transfers involving a consumer's account . . . at the time the consumer contracts for an electronic fund transfer," and do so in "readily understandable language."  15 U.S.C. § 1693c.  The summary judgment record suggests that beneficiaries were indicated on the accounts, that Deposit Agreements were sent to Mr. Lynch, and that those Deposit Agreements dictated the terms of POD accounts.  Accordingly, and viewing the facts in a light most favorable to Ally, the Estate is not entitled to summary judgment on the question of whether written authorization was required.

**IV.  Breach of Contract**

The Estate's breach of contract claim is premised in part on Ally's failure to pay.  Because the Court cannot yet determine that the Estate is entitled to the funds, it cannot grant judgment as a matter of law on that claim.

The Estate also alleges various violations of the Deposit

---

whether the EFTA exception may be ignored if the bank receives a call through a third-party contractor.

[4] It has been held that there is no private right of action or remedy under the E-Sign Act.  *See Herrera v. Navient Corps.*, No. 19-CV-6583 (AMD/VMS), 2020 WL 3960507, at *5 (E.D.N.Y. July 13, 2020).

Agreement.  The Estate first highlights Section II.C.3, which states that Ally "may pay checks or follow other instructions if we reasonably believe you have authorized the checks or instructions."  Section II.C.3 further provides that to determine "whether a check or instructions are authorized, we may refer to the [customer] signatures" in the bank's records.

The Estate argues that this provision is proof that a POD designation cannot be oral.  It is not clear, however, that Section II.C.3 dictates requirements for PODs.  Instead, as Ally argues in its opposition memorandum, Section II.C.3 provides guidelines for confirming the authenticity of either a signature or instruction, giving the bank the ability to confirm such authenticity based upon either "reasonable belief" or a signature confirmation.

The Estate also cites Section II.C.7, which states:

> We will send or make available to you a periodic statement showing the activity on your accounts and containing information sufficient to allow you to reasonably identify the items paid . . . You must examine the statement . . . and notify us of any unauthorized signature . . . or error on the statement.

While the Estate argues that this provision shows an authorized signature is required to initiate a transfer of funds, there is no reference in Section II.C.7 to a signature requirement.  Allowing for notification by the customer of an unauthorized signature is not the same as requiring the customer's signature for a particular type of account.

15

The Estate's next contention, that Section II.C.7 promises the bank will provide customers with information sufficient to identify and correct unauthorized transfers, is plainly correct. Again, however, it is not clear how this pertains to a POD designation, as a "periodic statement" reflecting "items paid" would have little relevance to a one-time payment that occurs after the death of the account holder.

The Estate further cites the privacy provision in Section II.D.9, which states that Ally "will disclose information about your account or transfers you make" under six listed conditions, including when the account holder grants written permission, "[w]here it is necessary for completing transfers," and in order to comply with a government agency or court order.  The Estate submits that Ally breached this privacy provision when it notified BFAS of the beneficiary designation in the bank's records.  Viewing the facts in light most favorable to Ally, there was no improper disclosure in this case.  If Mr. Lynch did, in fact, designate BFAS as the beneficiary on his accounts, he would clearly have contemplated notification upon his death and no privacy interest was infringed.

**V.   VCPA Claim**

In addition to claiming breach of contract and fraud, the Estate asserts a claim under the VCPA.  Ally submits that the VCPA is irrelevant because Utah law governs its actions.  The

Court need not address that question at this time, as summary judgment on the VCPA claim is not currently warranted.

The VCPA provides that "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce" are unlawful.  9 V.S.A. § 2453.  A consumer who "contracts for goods and services in reliance upon false or fraudulent representations or practices prohibited by section 2453 of this title, or who sustains damages or injury as a result of any false or fraudulent representations prohibited by section 2453 of this title, . . . may sue" to recover damages, "reasonable attorney's fees" and "exemplary damages not to exceed three times the value of consideration given by the consumer."  9 V.S.A. § 2461(a).

Section 2453 prohibits "unfair or deceptive acts or practices in commerce."  9 V.S.A. § 2453(a).  To establish a deceptive act or practice, the VCPA requires: a representation, omission, or practice likely to mislead consumers; that the consumer be interpreting the message reasonably under the circumstances; and that the misleading effects be material, such that they are "likely to affect the consumer's conduct or decision regarding the product [or service]."  *Madowitz v. Woods at Killington Owners' Ass'n, Inc.*, 2014 VT 21, ¶ 23.  "'[D]eception' is measured by an objective standard, looking to whether the alleged representation or omission had the capacity or tendency to deceive a reasonable consumer; actual injury need

17

not be shown." *Carter v. Gugliuzzi*, 168 Vt. 48, 56 (1998); *see L'Esperance v. Benware*, 2003 VT 43, ¶¶ 14-16.

The Estate argues that "Ally's practice of secretly placing POD designations on a customer's account without written authorization . . . is, as a matter of law, unfair and deceptive." ECF No. 74 at 16. The Estate also contends that the failure to disclose on bank statements that the accounts had a POD designation constituted material omissions. Finally, the Estate submits that after Mr. Lynch's death, Ally continued to engage in unfair and deceptive acts by compelling the Administrator to provide a court order and failing to reveal that it had no evidence of a telephonic beneficiary designation.

Ally submits that there was no misleading conduct, in part because its records show that Mr. Lynch opened the accounts as POD beneficiary accounts. Ally also contends that bank statements sent in early 2018, prior to its knowledge of Mr. Lynch's death, identified BFAS as the beneficiary of each of the accounts. With respect to Ally's interactions with the Estate, Ally submits that the Estate is misrepresenting its communications about the available evidence.

Viewing the facts in Ally's favor, the Estate is not entitled to summary judgment on the VCPA claim. Ally's records indicate communications with Mr. Lynch and the designation of a beneficiary. Whether those communications actually happened, or

were instead "secret" entries, is disputed. With respect to Ally's interactions with the Estate, the undisputed facts do not establish that its communications misled anyone, or that they inflicted the sort of transactional reliance and harm contemplated by the VCPA. *See Wilder v. Aetna Life & Cas. Ins. Co.*, 140 Vt. 16, 18 (1981) ("The Consumer Fraud Act was created to protect citizens from unfair and deceptive acts in consumer transactions."). The Estate's motion for summary judgment on its VCPA claim is denied.

## VI. Ally's Interpleader Action

The Estate further moves for summary judgment on Ally's interpleader action, arguing that Ally should not be allowed to deposit funds into a Court account and should not be dismissed from the case in light of the counterclaims raised by both defendants. The Court has ruled on Ally's interpleader action in a separate order. The Estate's arguments on this point are therefore moot.

## Conclusion

For the reasons set forth above, the Estate's motion for summary judgment (ECF No. 74) is **denied** without prejudice. Any party may move for summary judgment after the parties have engaged in additional discovery.

The parties shall submit a stipulated proposed discovery order within 30 days. If the parties cannot agree to a

stipulated proposed order, they shall submit separate proposals with supporting memoranda within that same 30-day time period. Ally's motion to extend the discovery schedule (ECF No. 100) is **denied** as moot.

DATED at Burlington, in the District of Vermont, this 6th day of August, 2020.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge
